UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No: 9:22-cv-81733-DMM

**KATHERINE HODGIN, M.D.,**

      Plaintiff,

v.

**INTENSIVE CARE CONSORTIUM INC.**
One Park Plaza
Nashville, TN 37203

**JFK MEDICAL CENTER LIMITED PARTNERSHIP**
One Park Plaza
Nashville, TN 37203

**HCA INC.**
One Park Plaza
Nashville, TN 37203

**HCA PHYSICIAN SERVICES , INC.**
One Park Plaza
Nashville, TN 37203

      Defendants.

_____/

**<u>FIRST AMENDED COMPLAINT[1]</u>**
**<u>FOR DAMAGES AND OTHER RELIEF- JURY TRIAL DEMANDED</u>**

Plaintiff, KATHERINE HODGIN, M.D., by and through her undersigned counsel,

sues the defendants, Intensive Care Consortium Inc. ("ICC"), JFK Medical Center Limited

Partnership (d/b/a HCA Florida JFK Hospital and JFK Medical Center Inc.), HCA, Inc.

("HCA"), and HCA Physician Services Inc. (D/B/A HCA Healthcare Physician Services

Group) (hereinafter "PSG"), and alleges as follows:

---

[1] Plaintiff files this amended complaint pursuant to FRCP 15(a) in order to correct the name and address of
Defendant PSG and other scrivener's errors.

**INTRODUCTION**

1.      This is an action for damages and to remedy breaches of contract and violations of Title VII of the Civil Rights Act of 1964 as amended ("Title VII") and the Florida Civil Rights Act, §§ 760.01, *et seq*., ("FCRA"), and to redress related injuries inflicted by Defendants.

2.      This action against Defendants is brought by Katherine Hodgin, M.D., a female critical care physician who was employed by the defendants. Dr. Hodgin was hired to work as a critical care physician in April 2017, and in May 2020 she was promoted to the position of Intensive Care Unit ("ICU") Associate Medical Director of Neurocritical Care at HCA Florida JFK Hospital ("the Hospital"), which is located in Atlantis, Palm Beach County, Florida. Throughout her employment, Dr. Hodgin diligently served patients at the Hospital. She saved lives during the height of the COVID-19 pandemic. She is well regarded in her field and well qualified for the position she held. It is because of her excellent performance, care, and professionalism that the defendants selected Dr. Hodgin for the aforementioned promotion in 2020. She worked in the latter role pursuant to an Employment Agreement ("EA"), a true and correct copy of which is attached as Exhibit 1 hereto.

3.      During the course of her employment with Defendants, Dr. Hodgin suffered from, and complained internally about, sexual harassment by male physicians and disparate treatment of her (and other female physicians) compared to her male peers on account of her (and their) gender. Instead of properly investigating and remedying the situation, Defendants turned the tables and fired Dr. Hodgin from her employment prior to the natural termination date of the EA. She was terminated on November 12, 2021. Defendants did so without any legitimate reason for her termination but instead were motivated by discriminatory and retaliatory animus.

4.      Plaintiff seeks all legal and equitable relief available under Title VII and the

FCRA, as well as her costs, including reasonable attorneys' fees.

5.      Plaintiff seeks damages and all legal and equitable relief available for breaches of contract. As noted, Dr. Hodgin's employment with Defendants was subject to the terms of an Employment Agreement ("EA") entered into between Defendant ICC and Plaintiff.  The EA naturally terminated on May 14, 2022 but it was terminated early on November 12, 2021. Under the contract, Dr. Hodgin could not be fired except under the circumstances and conditions set forth explicitly in the contract. None of those circumstances and conditions was met. Yet, Defendants ICC and PSG, by and through Dr. Carlos Moas (CMO/President) noticed her termination early in breach of the contract. Plaintiff seeks all legal and equitable relief available under Florida law for breach of contract, as well as her costs, including reasonable attorneys' fees.

6.      Plaintiff also seeks promissory estoppel against all Defendants. Acting as her joint employers, Defendants induced her to rely upon HCA Inc.'s Internal Handling of Reports to the Ethics Line policy ("the Hot line Policy"), a true and correct copy of which is attached as Exhibit 2 hereto. As a result, she reported a workplace complaint of sexual harassment and discrimination to the hot line referred to in the policy on October 18, 2021. Subsequently, she was terminated in retaliation for that complaint. Plaintiff seeks all legal and equitable relief available under Florida law, as well as her costs, including reasonable attorneys' fees.

## JURISDICTION, PARTIES, VENUE

7.      This court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). The Court has jurisdiction to grant declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202. The court has supplemental jurisdiction to determine the state and common law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in the Southern District of Florida because the unlawful acts which gave rise to this Complaint occurred within the city of Atlantis in Palm Beach County, Florida making venue proper in this District pursuant to 28 U.S.C. § 1391 and the defendants are subject to personal jurisdiction here. The defendants are and were during all material times operating hospitals and clinics in Palm Beach County, Florida. Each of the defendants is also subject to personal jurisdiction and acted as her joint employer as follows:

a.     JFK Medical Center Limited Partnership is a foreign limited partnership whose headquarters is located in Tennessee but whose principal place of doing business is at the Hospital, which is a 486 bed medical center, in Atlantis, Florida located at 5301 S Congress Ave. 22462. It was at this hospital where Dr. Hodgin worked and the material events in this lawsuit took place. Its business is to provide healthcare to patients in Atlantis, Florida. At all relevant times, the Hospital's leadership included CEO Gina Melby and Chairperson Jack Zeltzer (who also served as Chief of Surgery). This leadership acted on the Hospital's behalf, including making decisions impacting to the terms and conditions of Dr. Hodgin's employment at the Hospital, often jointly with the other Defendants and/or their representatives. It had authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours, and was involved in day-to-day supervision of employees, including employee discipline.

b.     HCA Physician Services Inc. (D/B/A HCA Healthcare Physician Services Group) ( "PSG"), is a Florida foreign profit corporation whose headquarters is in Nashville, Tennessee. PSG oversees the employment terms and conditions of physicians at the Hospital, including Dr. Hodgin's. PSG's representatives had power to hire and fire those physicians, often in conference with the other Defendants. PSG physicians work primarily or exclusively in Defendant HCA,

4

Inc.'s healthcare facilities, including at the Hospital in Atlantis, Florida. PSG's representatives are involved in and oversee the operation of the Hospital. Dr. Hodgin's direct supervisor, Dr. Adam Friedlander, was a representative of Defendants ICC, the Hospital, PSG and HCA, Inc.. He simultaneously held the positions of ICU Medical Director at the Hospital, and was Director of Defendant Intensive Care Consortium Inc.'s Graduate Medical Education Critical Care Rotation program. He was among the PSG leadership and representatives who acted on PSG's behalf to make decisions about the terms and conditions of Dr. Hodgin's employment at the Hospital, often jointly with the other Defendants and/or their representatives. PSG had authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours, and was involved in day-to-day supervision of employees, including employee discipline. Moreover, PSG had control of Dr. Hodgin's and her colleagues records, including payroll, insurance, and taxes. As its authorized representative, PSG President Dr. Carlos Moas terminated Dr. Hodgin via a written letter.

      c.      HCA, Inc. is a foreign profit corporation whose headquarters is in Tennessee, but who is in the business of hospital administration and healthcare in Atlantis, Florida. HCA, Inc. was and is directly involved in decisions impacting the terms and conditions of employment for physicians at the Hospital. It has authority to direct the hiring and firing of employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours. Moreover, HCA Inc. had and has control of Dr. Hodgin's employee records, including her hot line complaint, payroll, insurance, and taxes. It is the defendants' policy and practice that HCA, Inc. is responsible for intake of reports of discrimination, investigating workplace complaints, and determining corrective action jointly with the other Defendants' leadership and representatives. A true and correct copy of the policy

outlining HCA Inc.'s role in determining employment conditions at the Hospital as they relate to this matter is attached hereto as Exhibit 2. Moreover, HCA Inc.'s Chief Medical Officer ("CMO") is in Dr. Friedlander's chain of command, as well that of Defendant JFK Medical Center Limited Partner's CEO Gina Melby. At all relevant times, HCA, Inc. representatives acted on behalf of Defendant HCA, Inc. to make decisions about the employment terms and conditions at the Hospital, including those impacting Dr. Hodgin, often jointly with the other Defendants and/or their representatives.

d.      Intensive Care Consortium Inc. ("ICC") is a Florida profit corporation doing business in Atlantis, Florida. ICC is primarily in the business of hiring, employing, and firing physicians working in HCA healthcare facilities, including at the Hospital in Atlantis, Florida. Its employees, officers, managers, and representatives are involved in and oversee the operation of the Hospital. ICC hired and fired Dr. Hodgin, and also set conditions of employment, including compensation, benefits, and hours, and was involved in day-to-day supervision of employees, including employee discipline. Moreover, ICC controls Dr. Hodgin's employment records, including payroll, insurance, and taxes. As its authorized representative, CMO/ President Carlos Moas noticed Dr. Hodgin's termination via letter.

9.      Defendants at all material times were Plaintiff's "employer", jointly, as contemplated by Title VII and the FCRA. This included that they jointly exercised significant control as to the terms, conditions, and privileges of her employment, including but not limited to as noted in paragraph 8(a)-(d) above, and as noted in the facts below.

10.     At all material times, Plaintiff has been a citizen and resident of Broward County, Florida and is otherwise *sui juris*. At all material times, Plaintiff was protected by Title VII and the FCRA because she is female, because the terms, conditions, and privileges of her

employment were altered because of her gender, and because she engaged in protected activity under Title VII and the FCRA.

## SATISFACTION OF CONDITIONS PRECEDENT

11.     Defendants have each, at all times material hereto, employed 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year.

12.     Plaintiff, on or about January 28, 2022, filed Charges of Discrimination with the Equal Employment Opportunity Commission, which assigned it the EEOC Case Numbers:

510-2022-02607

510-2022-02605

510-2022-02610

510-2022-02611

510-2022-02615

510-2022-02619

510-2022-02621

13.     The filings stated in the preceding paragraph satisfied the filing requirements and perfected plaintiff's rights under the Florida Civil Rights Act. The charges filed were served and received by the defendants.

14.     The EEOC issued a Notice of Right to Sue to Plaintiff dated August 8, 2022, by which Plaintiff's right to sue for sexual harassment and other claims under Title VII and FCRA accrued, a true and correct copy of which is filed as Exhibit 3 hereto, and within 90 days of receipt of the notice Plaintiff brought this action.

15.     The FCHR deferred its handling of the case to the EEOC without either

conciliating or making a finding adverse to plaintiff within 180 days of the filing of the Charge

of Discrimination, which failure to act satisfies Plaintiff's exhaustion of administrative remedies

requirement and now entitles her to maintain a civil action.

16.     All other conditions precedent to the filing of this action have been performed or

waived.

## ADDITIONAL GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### Dr. Hodgin Was Well Qualified and Performed Well As Defendants' Employee.

17.     As noted above, Dr. Hodgin began working as a critical care physician in April

2017 in the intensive care unit ("ICU") at JFK Medical Center ("the Hospital") in Atlantis,

Florida. In May 2020, she was promoted to the position of ICU Associate Medical Director of

Neurocritical Care. In this position she reported directly to ICU Medical Director of the Hospital,

Dr. Adam Friedlander.

18.     On May 15, 2020, Dr. Hodgin entered into a new Employment Agreement

("EA"), identified as ICC-234488 (Exhibit 1).  The EA was executed by Ed Stevinson who holds

the position of Vice President for Defendant ICC.

19.     In addition to Defendant ICC, Dr. Hodgin's chain of command included

employees and representatives of the other Defendants: At all relevant times, Dr. Friedlander

held the position of Director of Defendant ICC's Graduate Medical Education Critical Care

Rotation program at those campuses. And also Dr. Friedlander was a representative of Defendant

PSG and Defendant HCA, Inc..  Defendants authorize and require Dr. Friedlander's signature

line for all emails, including those related to Dr. Hodgin's employment, to include information

that he is a representative of each of the defendants. Dr. Friedlander's direct supervisor was Dr.

Pablo Herscovici, who served as an intensive care physician and ICU medical director at

Defendant JFK Medical Center Limited Partnership's Hospital, as regional medical director for Defendant ICC, and as Vice President of Defendant PSG. Dr. Herscovici was also a representative of Defendant HCA, Inc. in Florida. CEO Gina Melby and CMO Jack Zelzter of Defendant JFK Medical Center Limited Partnership were in the chain of command as well, exercising significant control over Dr. Hodgin's employment conditions and terms.

20.     At all material times, the defendants exercised significant control over conditions, terms and the nature of Dr. Hodgin's employment. HCA Healthcare determined employment policies, including the reporting and internal handling of reports to an ethics line, pursuant to the Hot line Policy, Exhibit 2. Moreover, the defendants had the power to hire or fire physicians and staff at the Hospital who participated in sexual harassment and discrimination against Dr. Hodgin, and could have intervened against discrimination, hostility, and retaliation at the Hospital. Defendants' representatives engaged in-person, telephone, and email discussions, and had other direct involvement with Dr. Hodgin's terms and conditions of employment, including as they relate to her termination.

21.     Dr. Hodgin's clinical skills were never at issue and she provided excellent care to patients. As a physician, Dr. Hodgin's primary duties and responsibilities include patient care and overseeing other physicians, interns, nursing staff, and hospital staff. She was qualified for her position based on her experience and training. As noted in a recommendation letter written about her by the medical director of Cardiovascular Services, a true and correct copy of which is enclosed as Exhibit 4, she was a "hero" of the Hospital during the COVID-19 pandemic.

22.     Dr. Hodgin's record of professionalism earned her the aforementioned promotion and she behaved as professionally as, if not more professionally, than her male counterparts.

**A Hostile Work Environment and Disparate Treatment Was Pervasive at Hospital.**

23.     Defendants were aware that the Plaintiff was a female, and this caused the defendants to discriminate against her, harass her, and retaliate against her.

24.     In 2019, female physicians in emergency care were assigned to work the ICU as COVID-19 patients poured into the facility. Male physicians were not routinely assigned to this role.

25.     Male physicians regularly rampaged around the Hospital and demonstrated poor clinical skills without consequence. But female physicians and nurses were talked down to, continuously criticized, and were not taken seriously even when they performed better than their male counterparts. On information and belief, there were no other male physicians working for the defendants at the Hospital that were subjected to the same treatment.

26.     Defendants' were all responsible for intervening in the hostile work environment and stopping the discrimination, but failed to conduct appropriate investigations of hot line complaints received, and other reports regarding the work environment. The defendants did not otherwise adequately address the aforementioned workplace issues.

**Dr. Hodgin Reports Sexual Harassment and Discrimination Via HCA Hot line On October 18, 2021.**

27.     On October 18, 2021, Dr. Hodgin reported sexual harassment to Defendant HCA Inc. via the aforementioned compliance and ethics hot line pursuant to the protocols required by the defendants for reporting complaints of discrimination and harassment. (The policy is contained in Exhibit 2.) Her complaint specifically alleged systemic misogyny and sexual harassment in the cardiovascular unit and ICU. On information and belief, Defendant HCA, Inc. has control and possession of the original hot line complaint or a record thereof, and assigned it internal case number 2110HCA1015.

28.     On October 18, 2021, Dr. Hodgin's complaint with the HCA Ethics & Complaint Hot line provided details regarding an advanced heart failure cardiologist who was her co-worker. On that day, the cardiologist was outside Medical Surgical Intensive Care Unit ("MSICU") number 2015 around 9AM discussing a patient in room MRN 0601330. The cardiologist was conducting heart failure rounds when he was witnessed by multiple people, including the patient's nurse and residents, verbally abusing Dr. Hodgin. Dr. Hodgin reported this to her direct supervisor, Dr. Friedlander. When Dr. Friedlander interviewed the patient's nurse, he validated Dr. Hodgin's version of events.

29.     Dr. Hodgin notified Dr. Friedlander that she had called the HCA Ethics & Compliance Hot line to report her experience; and the supervisor notified the Hospital's CEO, Gina Melby, the Chief Medical Officer of the Hospital, Jack Zeltzer, and the cardiologist's supervisor who was the Chief of Staff and Vascular Surgeon at the Hospital of the report.

30.     Dr. Hodgin's October 18, 2021 report to her supervisor and the hot line specifically stated that the cardiologist's behavior constituted sexual harassment and represented systemic misogyny at the Hospital, and that sexual harassment and gender discrimination in the workplace created a hostile work environment for female physicians at the Hospital, including her.

**<u>Other Instances of Disparate Treatment and Sexual Harassment.</u>**

31.     Dr. Hodgin's complaint was not appropriately investigated. Had it been, Dr. Hodgin would have detailed a pervasive and dangerous hostile work environment and frequent discrimination against female employees at the Hospital.

32.     As noted above, male physicians treated female coworkers unprofessionally and practice poor medicine regularly at the Hospital. Despite notoriously poor behavior, their

11

authority grew, and the defendants retained their employment. In contrast, Defendants'
leadership disregard female physician authority and opinions, terminate female physicians
without significant cause, and fired those who spoke out against a dangerous and toxic work
environment.

33.     For example, in 2018 the Hospital hired a locums tecum as a CVI ICU intensivist.
The intensivist engaged in inappropriate sexual relations with nurses on staff in a manner that
began to affect patient care. Dr. Hodgin reported this behavior to Dr. Herscovici. Rather than
take Dr. Hodgin's report seriously, Dr. Herscovici rendered her "hysterical" during a
teleconference. On the same call, the President of Defendant ICC, Carlos Moas, stated that he did
not believe Dr. Hodgin's claims and hung up the phone. Later, Dr. Hodgin discussed the incident
over lunch with the Hospital's CMO Dr. Hamid Feiz and CEO Gina Melby. Dr. Hodgin stated
that the President's comments represented disregard for her report of sexual harassment and were
part of the pervasive misogyny at the Hospital. Still, the locums tecum intensivist was permitted
to finish his contract term at the Hospital. No action was taken to remedy these issues.

34.     In 2018, Dr. Hodgin reported another male physician for screaming at a female
resident at a nursing station in front of patients and other staff.  That other physician yelled that
he did not want to talk to the female resident, "but wanted to talk to someone with a dick." Dr.
Hodgin was present during this exchange. Dr. Hodgin became aware the physician made this
comment, or similar, to other colleagues and nurses. She became aware that he threw instruments
at nurses and screamed obscenities in the ICU. Dr. Hodgin and others reported his sexual
harassment and unprofessionalism to Hospital administration. But to Dr. Hodgin's knowledge,
that physician was never reprimanded and he remained employed. This physician's harassment
and unprofessionalism was encouraged by his supervisors, including the Director of

Cardiothoracic Surgery. The Director discussed this matter with Dr. Hodgin and her direct supervisor, Dr. Adam Friedlander. During this conference, he made clear his disregard for Dr. Hodgin's reports of sexism or retaliation. He dismissed her report and stated: "I love women and I have a bunch of them in my house." The defendants took no other steps to address the other physician's behavior, nor supervisors' complicity, nor the hostile environment, which persisted. This inaction had a chilling effect on Dr. Hodgin's willingness to report future incidents of sexual harassment and unprofessionalism for approximately two years.

35.     There were other regular instances of harassment and discrimination. In September 2020, Dr. Hodgin was treating a 35-year-old patient who had a fatally ruptured appendix. She referred the patient to yet a male physician for emergency surgery. He disregarded her opinion and refused to accept the patient because she had COVID-19. That physician wrote inflammatory statements in the chart about Dr. Hodgin. Dr. Hodgin had to seek the support of her male supervisor, Dr. Friedlander, in order to overcome his protests to provide patient care. The patient did, eventually, receive surgery and survived. Dr. Hodgin reported this incident to those in her chain of command. Rather than reprimand that physician, the Chief of Surgery, CEO, CMO, and her second-line supervisor criticized Dr. Hodgin and defended the male physician.

36.     There are additional incidents of the lesser standards Defendants held male physicians to compared to female physicians. In 2020, a male physician ordered an unnecessary catheter procedure for a patient. A peer review referral by Dr. Hodgin and Dr. Friedlander is on record with Defendants. Similarly, in July 2021, the same physician left a surgical resident and intern unsupervised during a dialysis catheter procedure. The resident and intern poked the patient over 20 times. The patient died. Also, that physician oversaw a patient with severe

13

peritonitis and refused to provide pain control. That physician insisted on a dialysis catheter for a dying patient, who passed two days later in hospice. Dr. Hodgin reported these incidents to the defendants via Defendant HCA Inc.'s hot line (internal charge. No. 510-2022-2610/2621 was assigned), but she was terminated before the resolution of the investigation. That physician remained employed at the Hospital despite poorly performing and his unprofessionalism.

37.     Another bad actor was the Director of Advanced Heart Failure at the Hospital. He refused to talk to patients after their initial evaluations. He delegated this task to female physicians. He abdicated his responsibility to conduct rounds with the intensive care team considering the task "a waste of time." He engaged in poor medical practice as well. On one occasion, Dr. Hodgin reported to Defendants that he inserted a pacemaker in a dying patient and then billed for the unnecessary medical procedure. The patient passed the next day, such that the pacemaker did not extend his life and lacked ethical compliance.

    In March 2021, the Director of Advanced Heart Failure screamed at nursing staff, Dr. Hodgin and another female physician. Dr. Hodgin reported the incident to Dr. Friedlander and witnessed the other female physician reporting the incident as well. Dr. Friedlander responded that if the other physician insisted on elevating the complaint to human resources, she would be fired. Dr. Hodgin witnessed this conversation, which had a chilling effect on her. The other female physician was terminated. This additionally chilled her willingness to report incidents of sexual harassment. The Director of Advanced Heart Failure remained employed.

38.     Led by a cast of bad actors, the work environment grew increasingly toxic for female healthcare workers and dangerous for patients, despite Dr. Hodgin's efforts to report and stop bad behavior within her power. Female physicians were terminated while unprofessional and poor performing male physicians remained on staff in her workplace.

14

39.     Such a disparate standard of professionalism and work performance reveals the defendants' gendered expectations for its workers. The sexual harassment she experienced, as well as the inequity in treatment and professional standards between men and women, is unlawful under federal and state law, including Title VII of the Civil Rights Act of 1964 and the Florida Human Rights Act. The termination of those who dared to report bad behavior was unlawful retaliation.

### Dr. Hodgin is Terminated.

40.     Dr. Hodgin's direct supervisor, Dr. Friedlander, spoke on the telephone with Dr. Christopher Ott, Chief Medical Officer of Defendants PSG and HCA, Inc. to inform him about the subject of Dr. Hodgin's October 18, 2021 hot line complaint and support her version of the story. He noted that Dr. Ott was in his "chain of command" in an email summarizing the conversation, a true and correct copy of these emails are attached here as Exhibit 5.

41.     On November 12, 2021, Dr. Carlos Moas, CMO/President of ICC and PSG, sent Dr. Hodgin a letter noticing her immediate termination.

42.     The letter noted her termination is "without cause."

43.     Defendants knew about Dr. Hodgin's hot line complaint, and were significantly motivated by unlawful discriminatory and retaliatory motive in deciding to terminate Dr. Hodgin.

44.     On November 15, 2021, Dr. Friedlander sent a follow up email to Dr. Ott and noted he was "saddened and outraged by what happened to [Dr. Hodgin]." (See Exhibit 5) On November 17, 2021 at 6:04 AM, Dr. Friedlander emailed Dr. Ott, reiterating his ongoing concern that the Hospital CMO, Chief of Staff, and his direct report did not investigate or acknowledge the incidents. Dr. Ott responded acknowledging his receipt and stated he reached out to Ethics and HR

regarding the matter. (See Exhibit 5)

45.     On information and belief, none of the defendants investigated her complaint and the termination proceeded. None of the Defendants who knew about the termination and had the power to intervene, reverse, and investigate ICC's termination of Dr. Hodgin acted to stop this unlawful retaliation.

46.     Dr. Hodgin suffered significant damage to her business reputation and suffered economic hardship as a result of her sudden, wrongful termination without notice and legitimate cause. She remained under-employed until October 2022 as a result of Defendants' malicious acts, and continues to make less than she would have but for the termination.

47.     Plaintiff engaged the undersigned attorney to prosecute her claims arising from the events described above, and she is entitled to recover her attorney's fees from Defendants pursuant to statute.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
### Wrongful Termination

48.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 47, inclusive, as though same were fully re-written here.

49.     At all times asserted herein, the PLAINTIFF was in a contractual relationship with DEFENDANTS ICC and PSG as such, pursuant to which Dr. Hodgin's employment should have naturally terminated on May 14, 2022.

50.     That contract enumerated grounds for her immediate termination. But Dr. Hodgin was never accused of committing and has not committed any act that would qualify for immediate termination. Nonetheless, Defendants ICC and PSG terminated her effective

immediately on November 12, 2021.

51.    Defendants ICC and PSG did not have a legitimate reason to immediately terminate her employment.

52.    As a direct result of Defendants ICC's and PSG's unlawful actions, Dr. Hodgin suffered a loss of compensation and economic hardship.

53.    Plaintiff seeks the amount of the compensation she would have received but for the wrongful termination and such other legal and equitable relief this Court deems just and proper based on Defendants ICC's and PSG's unlawful conduct.

**COUNT II-**
**Promissory Estoppel**

.    54.    Plaintiff incorporates herein the allegations contained in paragraphs 1-47, inclusive, as though same were fully re-written here.

55.    Defendants reasonably expected to induce Plaintiff and did induce Plaintiff to rely on its promises contained within HCA, Inc.'s Internal Handling of Reports to the Ethics Line policy ("the Hot line Policy"), which promises that the defendants would not discriminate against her or permit a hostile work environment at her place of work during the course of her employment and, that if she reported such instances to the hot line, Defendants would not retaliate against her or allow ICC to retaliate against her.

56.    Plaintiff reasonably relied on Defendants' promises in the Hot line Policy and made a report of sexual harassment and discrimination to the hot line on October 18, 2022.

57.    Defendants refused to honor their promises made to Plaintiff in the EA by permitting ICC and PSG to terminate her employment in retaliation for complaining about sexual harassment and discrimination. And, they failed to appropriately and timely investigate

her complaints pursuant to the policy.

58.     As a direct result of Defendants' unlawful actions, Dr. Hodgin suffered a loss of compensation and economic hardship. Specifically, her contract was terminated earlier than it should have been because of Defendants' unlawful actions.

59.     Plaintiff seeks the amount of the compensation she would have received but for Defendants' unlawful conduct, and such other legal and equitable relief this Court deems just and proper based on Defendants' unlawful conduct.

**COUNT III: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. § 2000E Et. Seq. - Discrimination on the Basis of Gender- Disparate Treatment)**

60.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 47, inclusive, as though same were fully re-written here.

61.     Plaintiff sues under Title VII for damages because Defendants discriminated against her on the basis of her gender (female).

62.     At all relevant times, Defendants conducted business and operated out of the Southern District of Florida, employing greater than 15 employees and thus was an "employer" as defined in Title VII, and as such prohibited from discriminating in employment on the basis of gender. See 42 U.S.C. §2000e.

63.     At all times relevant, Defendants' supervisors, staff, and administrators were acting within the course and scope of their employment for the defendants.

64.     At all relevant times it was unlawful for Defendants, as an employer, discriminate against any individual with respect to compensation, terms, conditions and privileges of employment, because of gender. See 42 U.S.C. §2000e-2.

65.     At all relevant times, the Plaintiff was an employee within the meaning of Title VII, protected against discrimination in employment on the basis of her gender. See 42 U.S.C.

§2000e.

66.     Because Plaintiff is a woman, she was discriminated against by Defendants supervisors, staff, and administrators, and the defendants refused to take any action to prevent the discrimination in her workplace as alleged previously herein. As such, Plaintiff's gender was a determining factor in Defendants' employment decisions, including her compensation, terms and conditions of employment.

67.     Similarly situated male employees are not treated in the same manner as how Defendants treated Plaintiff.  The defendants do not terminate male employees for unprofessionalism, complaining about hostile work environment, discrimination, or workplace issues. Those male comparators are referenced throughout this complaint.

68.     Defendants' actions affected Plaintiff in the "compensation, terms, conditions and privileges of employment" as envisioned by 42 U.S.C. §  2000e-1(a)(1) and thus violated Title VII since she received less plum work assignments, was reprimanded, suffered adverse conditions and was eventually fired.

69.      As a direct, natural, proximate and foreseeable result of Defendants' actions, Plaintiff has suffered lost wages and benefits in the past and such losses will continue in the future. She has suffered emotional distress, inconvenience, embarrassment and other non-pecuniary damages and such damages will continue in the future.

70.      Defendants' purported reasons for the actions taken against Plaintiff are pretext for discrimination.

71.      As a direct and proximate result of Defendants' gender discrimination, the Plaintiff suffered lost earnings and benefits, impairment of earning capacity, benefits and/ or retirement benefits loss, loss of reputation, professional and personal embarrassment, and other

emotional distress, including anxiety, anguish, humiliation and other incidental and consequential damages and expenses and thus is entitled to monetary and compensatory relief.

72.     The conduct of Defendants, as set forth above, was intentional, willful, malicious, oppressive, reckless and done in complete disregard of the Plaintiff's right thereby justifying an award of punitive damages from the Defendants. The gender discrimination that Plaintiff suffered in violation of her federal statutory right to be free from such discrimination, constitutes irreparable harm for which there is no adequate remedy at law.

73.     As further direct and proximate result of the Defendants' violation of Title VII, as hereto as heretofore described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the laws of this State prohibiting such discrimination, and hence forced to incur legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff, who therefore will seek leave of Court to amend this Complaint in that regard when the same shall be fully and finally ascertained. As such, Plaintiff requests that attorneys' fees be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(k).

## COUNT IV- VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Sexual Harassment)

74.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 73, inclusive, as though same were fully re-written here.

75.     The Defendants caused or allowed the conduct described in the paragraphs above, which conduct was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and create a discriminatorily abusive work environment based on her gender, constituting sexual harassment pursuant to Title VII.

76.     As a direct and proximate result of Defendants' sexual harassment, the Plaintiff suffered lost earnings and benefits, impairment of earning capacity, benefits and/ or retirement

benefits loss, loss of reputation, professional and personal embarrassment, and other emotional distress, including anxiety, anguish, humiliation and other incidental and consequential damages and expenses and thus is entitled to monetary and compensatory relief.

77.     The conduct of Defendants, as set forth above, was intentional, willful, malicious, oppressive, reckless and done in complete disregard of the Plaintiffs' right thereby justifying an award of punitive damages from the Defendants. The sexual harassment that Plaintiff suffered in violation of her federal statutory right to be free from such harassment constitutes irreparable harm for which there is no adequate remedy at law.

78.     As further direct and proximate result of the Defendants' violation of Title VII, as hereto as heretofore described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the laws of this State prohibiting such discrimination, and hence forced to incur legal fees and costs, the full nature and extent of which are presently unknown to the Plaintiff, who therefore will seek leave of Court to amend this Complaint in that regard when the same shall be fully and finally ascertained. As such, Plaintiff requests that attorneys' fees be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(k).

## COUNT V - VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Retaliation)

79.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 78, inclusive, as though same were fully re-written here.

80.     Under federal law, Plaintiff has a right to report she and other women were being discriminated against, suffering from a hostile work environment and sexual harassment, and on other related workplace problems.

81.     The incidents alleged previously by the Plaintiff establish that the Defendants intentionally discriminated against her due to her race, or that she reasonably perceived the Defendants conduct as discriminatory based on her gender.

82.     The Plaintiff's complaints to her supervisors and the HCA hot line were protected activity and were a substantial or motivating factor in the decision to take materially adverse employment action against her by terminating Plaintiff's employment.

83.     A causal connection exists between the Plaintiff's protected activities as described above and the Defendants' decision to terminate her.

84.     The aforementioned acts of Defendants were intentional, mean spirited, done with malice and ill will and consistent with the mindset that discriminatory behavior was acceptable, and that any such complaints were to be responded to by termination and false accusations of unprofessionalism.

85.     As a direct and proximate result of the Defendants' actions as described above, Plaintiff has suffered compensatory damages including, back pay, front pay, loss of income and benefits, pension and/or retirement benefits, impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses.

86.     Defendants' actions were intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of causing harm to Plaintiff, entitling her to punitive damages under Title VII.

87.     As further direct and proximate result of the Defendants' violations of Title VII, as heretofore described, Plaintiff was compelled to retain the services of counsel in an effort to enforce the laws of this State prohibiting such discrimination, and hence forced to incur legal fees and costs, the full nature and extent of which are presently unknown to the Plaintiff, who

therefore will seek leave of Court to amend this Complaint in that regard when the same shall be fully and finally ascertained. As such, Plaintiff requests that attorneys' fees be awarded.

## COUNT VI- VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Discrimination on the Basis of Gender- Disparate Treatment)

88.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 47, 60 through 73, as though same were fully re-written here.

89.     Defendants' behavior towards Plaintiff was based on her gender and constituted gender discrimination as proscribed by Fla. Stat. § 760.10(1).

90.     The discrimination that Plaintiff suffered was in violation of her statutory right to be free of such discrimination based on her gender, constituted gender discrimination as proscribed by Fla. Stat. § 760.10(1), and constitutes irreparable harm for which there is no adequate remedy at law.

91.     As a direct and proximate result of the Defendants' actions as described above, the Plaintiff has suffered compensatory damages including, back pay, front pay, loss of income and benefits, pension and/or retirement benefits, impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses.

92.     Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses against Defendants pursuant to Fla. Stat. § 760.11(5).

## COUNT VII- VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Sexual Harassment)

93.      Plaintiff incorporates herein the allegations contained in paragraphs 1 through 42, 75-78, inclusive, as though same were fully re-written here.

94.     Defendants' sexual harassment of Plaintiff was based on her gender and constituted gender discrimination as proscribed by Fla. Stat. § 760.10(1), and constitutes irreparable harm for which there is no adequate remedy at law.

95.     As a direct and proximate result of the Defedants' actions as described above, Plaintiff has suffered compensatory damages including, back pay, front pay, loss of income and benefits, pension and/or retirement benefits, impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses.

96.     Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses against Defendants pursuant to Fla. Stat. § 760.11(5).

## COUNT VIII- VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT
### (Retaliation)

97.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 42, 80 through 87, inclusive, as though same were fully re-written here.

98.     Defendants' behavior towards Plaintiff was based on her protected activity and constitutes retaliation proscribed by Fla. Stat. § 760.10(7), and constitutes irreparable harm for which there is no adequate remedy at law.

99.     As a direct and proximate result of Defendants' actions as described above, Plaintiff has suffered compensatory damages including, back pay, front pay, loss of income and benefits, pension and/or retirement benefits, impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses.

100.    Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses against Defendants pursuant to Fla. Stat. § 760.11(5).

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF, KATHERINE HODGIN, seeks judgment against

24

DEFENDANTS, and respectfully requests the entry of a Judgment as follows:

(a)     Declare and adjudge DEFENDANT ICC and DEFENDANT PSG jointly and severally liable for breach of contract and award compensatory damages to PLAINTIFF the amount equal to the pay she would have received through the natural termination date of her contract, which shall be an amount determined at trial, plus reasonable costs and interest on the judgment at the statutory rate, and for such other relief as the Court may deem just and proper.

(b)     Declare and adjudge all DEFENDANTS jointly and severally liable for promissory estoppel and AWARD monetary, general, compensatory, equitable and/or special damages to PLAINTIFF in the amount of equal to the pay she would have received through the end of the natural termination date of the contract, which shall be an amount determined at trial, plus reasonable costs and interest on the judgment at the statutory rate, and for such other relief as the  Court may deem just and proper.

(c)     Declare and adjudge that all DEFENDANTS have violated the PLAINTIFF'S rights under 42 U.S.C. §2000e, et. seq. (Title VII), and Fla. Stat. Ch. 760, et. seq. (Florida Civil Rights Act);

(d)     Award compensatory and punitive damages to the PLAINTIFF against All DEFENDANTS to the full extent allowed under Title VII and the Florida Civil Rights Act in amount(s) to be determined at trial;

(e)     Award monetary, general, equitable and/or special damages to the PLAINTIFF under 42 U.S.C. §2000e, et. seq., and Fla. Stat. Ch. 760, et. seq., including but not limited to back pay [wages, salary, fringe benefits and pre-judgment interest], front pay, and medical and retirement benefits, preferential rights to jobs and other damages for lost compensation and job

benefits with pre-judgment and post-judgment interest suffered by the PLAINTIFF, to be determined at trial;

(f)      Award PLAINTIFF the costs and expenses incurred in this action, including reasonable attorneys' fees and other litigation expenses as provided by 42 U.S.C. §2000e, et. seq., and Fla. Stat. Ch. 760, et. seq.;

(g) Award statutory interest to the full extent provided by 42 U.S.C. §2000e, et. seq., and Fla. Stat. Ch. 760, et. seq. and;

(h) Award the PLAINTIFF any such additional relief as this Court deems just and proper.

## ADDITIONAL REQUEST FOR PECUNIARY DAMAGES

Any allegedly nondiscriminatory reason for the treatment of Plaintiff asserted by Defendants is a mere pretext for the actual reasons for the treatment; namely, Plaintiff being a woman and Plaintiff engaging in protected activity. Defendants' actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination due to her gender and from retaliation. The discrimination on the basis of sex constitutes unlawful discrimination. Moreover, Defendants intentionally and willfully induced her to rely on a Hot line Policy and report unlawful behavior, which ultimately made her vulnerable to retaliation and her termination. As a direct and proximate result of Defendants' intentional conduct, Plaintiff has suffered economic losses, loss of business reputation, as well as mental pain and suffering. In fact, Plaintiff was unemployed until October 2022 as a result of the damage done to her reputation because of the termination and now makes far less than she would have but her wrongful termination and Defendants unlawful actions. It also makes the Hospital a more dangerous and hostile place for patients, physicians, and nurses. For the public good, Defendants should be held to account.

WHEREFORE, Plaintiff hereby requests this Court enter judgment against the defendants for all wages and benefits the Plaintiff would have received but for the discrimination, including actual damages suffered, compensatory damages under the FCRA for embarrassment, anxiety, humiliation, and emotional distress, prejudgment and post-judgment interest, attorney's fees, costs, and such other and further relief as this Court deems just and appropriate to include maximum punitive damages permitted under law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 16th day of November 2022,

By:   /s/ Alison D. Rogers
Alison D. Rogers, FBN 124498
Rogers Law Practice PLLC
7154 N. University Dr. STE 188
Tamarac FL 33321
P: (954) 399-2188
F: 1 (954) 866-7106
alison@rogerslawpractice.com
Counsel for Plaintiff